STATE OF NORTH CAROLINA v. DAVID RAY WHITE

No. 90

(Filed 15 July 1980)

1. **Criminal Law § 32.1— use of presumption—due process—examination of words spoken to jury**

    In determining whether the use of a presumption in a criminal case violates due process, the nature of the presumption must first be determined by careful examination of the actual words spoken to the jury by the trial judge in the light of whatever definition of the presumption may be provided by applicable statute or case law and in the context of how a reasonable juror might interpret the words.

2. **Criminal Law § 32.1— presumption—due process—permissive inference**

    If, in the contemplation of a reasonable juror, the court's instructions on a presumption describe a mere *permissive* inference, due process is not violated so long as (1) there is a rational connection between the basic and elemental facts such that upon proof of the basic facts, the elemental facts are more likely than not to exist, and (2) there is other evidence in the case which, taken together with the inference of presumption, is sufficient for a jury to find the elemental facts beyond a reasonable doubt. Whether the necessary rational connection between the basic and elemental facts exists depends not on an examination of the permissive presumption in the abstract but rather on how the presumption is applied in the context of the particular facts of the given case.

3. **Criminal Law § 32.1— mandatory presumption—due process**

    If the words of an instruction describe an inference which must be drawn upon the proof of basic facts, then the presumption is *mandatory* in nature. Mandatory presumptions which conclusively prejudice the existence of an elemental issue or actually shift to defendant the burden to disprove the existence of an elemental fact violate the Due Process Clause.

4. **Criminal Law § 32.1— mandatory presumptions—requirement of rebutting evidence—due process**

    Mandatory presumptions which merely require defendant to come forward with *some evidence* (or take advantage of evidence already offered by the prosecution) to rebut the connection between the basic and elemental facts do not violate the Due Process Clause so long as in the presence of rebutting evidence (1) the mandatory presumption disappears, leaving only a mere permissive inference, and (2) the other requirements for permissive inferences are then met.

5. **Criminal Law § 32.1— mandatory presumption—quantum of rebutting evidence**

    Mandatory presumptions which require defendant to come forward with a quantum of evidence significantly greater than "some evidence" may run afoul of due process by shifting the burden of persuasion to defendant. In the

absence of *any* rebutting evidence, however, no issue is raised as to the nonexistence of the elemental facts and the jury may be directed to find the elemental facts if it finds the basic facts to exist beyond a reasonable doubt.

**6. Criminal Law § 32.1— mandatory presumption—examination upon face**

A mandatory presumption is generally examined upon its face, and its validity depends ultimately upon its hypothetical accuracy in the general run of cases in which it might be applied.

**7. Criminal Law § 32.1— prosecution's reliance solely on presumption—rational connection between basic and elemental facts**

If the prosecution relies solely upon a presumption, whether mandatory or permissive, to make out its case, then the rational connection between the basic and elemental facts must be such that a jury could infer the existence of the elemental facts beyond a reasonable doubt.

**8. Parent and Child § 1.1— mandatory presumption of husband's paternity—instruction shifting burden of persuasion—violation of due process**

In a prosecution for willful failure to provide support for a child conceived while defendant and the child's mother were living together as husband and wife, an instruction requiring defendant husband to offer evidence of the physical impossibility of his fatherhood in order to rebut the presumption of legitimacy of the child gave the State the benefit of a mandatory presumption of defendant's paternity and placed upon him a burden of production so stringent that, in effect, it unconstitutionally shifted the burden of persuasion to him, since due process precluded requiring defendant, in order to rebut the mandatory presumption, to do more than offer some evidence which was sufficient to raise a factual issue as to the paternity of the child.

**9. Parent and Child § 1.1— presumption of legitimacy—necessary rebutting evidence**

In order to raise a factual issue as to paternity, the evidence rebutting the presumption of legitimacy of a child born in wedlock must at least tend to show: (1) that defendant could not be the father because, for example, he did not in fact have sexual relations with his wife at a time when conception could have occurred; or (2) that even if defendant could be the father, some other man also could be the father because that other man had sexual relations with the mother at a time when conception could have occurred.

**10. Parent and Child § 1.1— child born during wedlock—permissible inference of paternity—burden of persuasion**

Upon the production of sufficient rebuttal evidence in a criminal case to raise an issue as to the paternity of a child, the presumption of legitimacy disappears and the State is left to prove paternity beyond a reasonable doubt from all the facts and circumstances. If, however, there is evidence in the case that the child was born or conceived during wedlock, the jury may be permitted, but not required, to infer paternity of the husband provided under all the facts and circumstances of a given case there is a rational connection between the facts proved and the elemental facts inferred. Furthermore, the State may rely entirely on the inference to make out its case provided under

all the facts and circumstances of a given case the rational connection is strong enough to permit the jury to make the inference beyond a reasonable doubt, but the burden of persuasion beyond a reasonable doubt remains with the State.

**11. Parent and Child § 1.1— presumption of husband's paternity—absence of rebutting evidence—proof child conceived or born in wedlock—peremptory jury instruction**

In absence of evidence rebutting the presumption of the husband's paternity, the State need only prove beyond a reasonable doubt that the child was conceived or born in wedlock, and the jury may then be instructed to find the issue of paternity against the husband, for there would be no evidence in the case raising an issue of his paternity.

**12. Parent and Child § 1.1— presumption of legitimacy—sufficiency of rebutting evidence—question of law**

Whether sufficient evidence has been offered to rebut the presumption of legitimacy becomes a question of law for the court if undisputed facts in a given case establish conclusively when conception could or could not have occurred and there is no dispute regarding when the husband had or could have had sexual relations with the mother or when some other man had sexual relations with her.

**13. Parent and Child § 1.1— presumption of husband's paternity—instruction requiring showing of physical impossibility to rebut presumption—improper shifting of burden of persuasion—absence of any rebutting evidence—no prejudice to husband**

Although the trial court's instruction requiring defendant husband to offer evidence of the physical impossibility of his fatherhood of a child born to his wife in order to rebut the presumption of legitimacy of the child placed too high a burden on defendant to rebut the presumption, defendant was not prejudiced by this error where there was no evidence in the case sufficient to raise an issue of paternity and thereby rebut the presumption since all the evidence showed that conception must have occurred when defendant was living with and could have had sexual relations with his wife and before her sexual encounters with another man, and neither the State nor defendant produced evidence that defendant could not be the father of the child or that someone other than defendant could be.

**14. Parent and Child § 1.1— presumption of husband's paternity—no showing wife living in open adultery**

The presumption of defendant husband's paternity of a child born to his wife was not rebutted by evidence that the wife was "notoriously living in open adultery" where the evidence showed that the wife had an affair with another man but did not show that the affair was notorious, open, or that she and the other man were living together at the time, and the evidence did not show that these events occurred at a time when conception could have occurred.

Justice CARLTON did not participate in the consideration or decision of this case.

Justice COPELAND dissenting.

BEFORE *Strickland, J.,* at the 4 December 1978 Session of JONES Superior Court, defendant was convicted by a jury of willfully refusing to provide adequate support for his child in violation of G.S. 14-322. From a judgment suspending a six-months term of imprisonment upon the condition, among others, that defendant support the child, defendant appealed to the Court of Appeals. In an opinion by *Judge Clark, Judge Vaughn* concurring, that Court found no error. *Judge,* now *Justice, Carlton,* dissented. Defendant appeals pursuant to G.S. 7A-30(2). This case was docketed and argued as No. 91, Fall Term 1979.

*Attorney General Rufus L. Edmisten, by Special Deputy Attorney General John R. B. Matthis, and Associate Attorney James C. Gulick for the State.*

*Ward & Smith, P.A., by Thomas E. Harris and C. H. Pope, Jr., for defendant appellant.*

EXUM, Justice.

The child in this case was conceived while defendant and her mother were living together as husband and wife. She was born after they had separated but during wedlock. There was some evidence that her mother had sexual relations with another man after conception and during the period of gestation. The question presented is whether under these circumstances a jury instruction on our common-law presumption of the child's legitimacy violated defendant's right to a trial by due process of law. We answer in the negative and affirm the Court of Appeals.

The State's evidence tended to show as follows: Dawn White and defendant were married on 9 January 1976 and have never been divorced. They separated several times but did live together as husband and wife in Jones County from 10 June 1977 until 12 August 1977, on which date they separated for the last time. Dawn White missed her menstrual cycle in July 1977, and a child, named Crystal White, was born to her on 4 May 1978, approximately nine calendar months after the month in which she first missed her menstrual cycle. The child weighed eight pounds, ten ounces at birth. Defendant has not provided any financial support for the child. Defendant is capable of providing such support and demand for support has been made upon him.

Dawn White admitted in her testimony that on 15 August 1977 she went to Asheville "to be with Carl Pinnley." While in Asheville she had sexual relations with Pinnley. Pinnley was Dawn White's former boyfriend whom she had known before her marriage to defendant. She also admitted that at some unspecified time she had an occasion to "get with Mike Saunders" in her home.

Defendant himself did not testify. He offered other witnesses including Carl Pinnley. Pinnley's testimony tended to show as follows: On 14 August 1977 he received a telephone call in Asheville, where he lived, from Dawn White, notifying him that she was coming to Asheville. She arrived there on 15 August. They "had an affair" which began on 15 August. He saw her "on a regular basis for the months of August, September, and October." She left Asheville and returned to Jones County shortly after Thanksgiving. He returned to Jones County to visit in Dawn White's family's home during Christmas 1977, but returned to Asheville in February 1978. He then visited Dawn White after the child was born; she told him that defendant was the child's father. He had written "love letters" to Dawn White both before and after her marriage to defendant.

On this evidence the trial judge instructed the jury, in part, as follows:

"Now ladies and gentlemen of the jury let me instruct you that when a child is born in wedlock, that is when a child is born during the marriage, of the mother, the law presumes that this child is the child of the husband of the mother at the time the child was born. Now the presumption of legitimacy of the child cannot be rebutted except by evidence tending to show the husband could not have access to the mother during the period of time the law recognizes as the period of time the child could have been conceived. This period of time which the law recognizes is the period of time sometimes referred to in the law as normal period of gestation. May be anywhere from seven, eight, nine, nine and a half or ten months from the date of birth of the child, and the only way the assumption of legitimacy may be rebutted is by evidence tending to show the husband could not have had access to the wife during the period of time referred to.

> In the absence of evidence to the contrary the term pregnancy is ten lunar months or 280 days. The state contends that the defendant had access to the mother of the child during the period of conception and that this child is the defendant's child. The defendant on the other hand, contends that others had access to the mother and this child is another's child and not the defendant's."

He also instructed the jury that before it could find defendant guilty of abandonment of the child, the State must prove beyond a reasonable doubt: (1) defendant was the father of the child; (2) defendant failed to provide the child with adequate support (properly defining these terms); and (3) such failure was "willful, that is intentional, and without justification or excuse." Thus, although the trial judge instructed the jury that the State must prove beyond a reasonable doubt that defendant was the father of the child, he also gave the State the benefit of our common-law presumption of defendant's paternity which, the trial judge said, could not be "rebutted except by evidence tending to show [the defendant] could not have had access to the mother" during the period of time in which the child could have been conceived. Since neither the State nor defendant offered evidence of such lack of access, the effect of the trial judge's instructions was to require the jury to find the issue of paternity against defendant, provided the jury found that the child was born during the marriage of the mother and the defendant.

Defendant's only assignments of error relate to the trial court's instructions on the presumption of legitimacy of the child. Defendant argues first that the instructions violate those principles of due process of law which require the State to prove beyond a reasonable doubt every essential element of the crime charged and which preclude placing upon a defendant any burden to prove the nonexistence of any such element. *See Mullaney v. Wilbur*, 421 U.S. 684 (1975); *Re Winship*, 397 U.S. 358 (1970). The impact of these principles upon the use of certain presumptions in North Carolina's law of homicide was fully explored by this Court in *State v. Hankerson*, 288 N.C. 632, 220 S.E. 2d 575 (1975). More recently, the United States Supreme Court has considered the due process implications of the use of presumptions by the prosecution in criminal cases in *Sandstrom v. Montana*, --- U.S. ---,

61 L.Ed. 2d 39 (1979) and *Ulster County Court v. Allen*, --- U.S. ---, 60 L.Ed. 2d 777 (1979).

*Winship*, a juvenile proceeding, held that the Fourteenth Amendment's Due Process Clause "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." 397 U.S. at 364. In *Mullaney* the Supreme Court dealt with a Maine jury instruction in a homicide case to the effect "that if the prosecution established that the homicide was both intentional and unlawful, malice of aforethought was to be conclusively implied unless the defendant proved by a fair preponderance of the evidence that he acted in the heat of passion on sudden provocation." 421 U.S. at 686. The jury instruction went on to explain "malice aforethought and heat of passion on sudden provocation are two inconsistent things" and that a defendant who proved the latter would thereby negate the former and reduce the homicide to manslaughter. The Supreme Court concluded that this kind of instruction violated the principle announced in *Winship* in that it impermissibly relieved the prosecution of the burden of proving malice, an essential element of murder under the law of Maine, beyond a reasonable doubt.

In *Hankerson* this Court considered the effect of *Mullaney* on this State's law of homicide. Like Maine, our law gave the prosecution the benefit of a presumption of malice when it proved that the defendant intentionally inflicted a wound upon a deceased with a deadly weapon which proximately caused death. The presumption had the effect of requiring the defendant to satisfy the jury of that legal provocation which would negate the element of malice and reduce the crime to manslaughter. In North Carolina the prosecution was also entitled to rely on a presumption of unlawfulness upon proof of the same facts which raised the presumption of malice. This presumption placed upon the defendant the burden of satisfying the jury that he killed in self-defense in order to negate unlawfulness and excuse the crime altogether. This Court held that the *Mullaney* decision precluded using our presumptions of malice and unlawfulness in such a way as to shift the burden of persuasion on these elements to the defendant. In other words, the State must, where the issues of malice and unlawfulness are raised by the evidence, bear the burden of persuading the jury of their existence beyond a reasonable doubt.

The defendant can be given no burden of persuading the jury of the nonexistence of these elements. This Court summarized the effect of *Mullaney* on our law of homicide as follows, 288 N.C. at 649-50, 220 S.E. 2d at 588:

"The *Mullaney* ruling does not, however, preclude all use of our traditional presumptions of malice and unlawfulness. It precludes only utilizing them in such a way as to relieve the state of the burden of proof on these elements when the issue of their existence is raised by the evidence. The presumptions themselves, standing alone, are valid and, we believe, constitutional. *State v. Williams*, 288 N.C. 680, 220 S.E. 2d 558 (1975); *State v. Sparks*, 285 N.C. 631, 207 S.E. 2d 712 (1974), pet. for cert. filed, 43 U.S.L.W. 3392 (U.S. Nov. 29, 1974) (No. 669). Neither, by reason of *Mullaney*, is it unconstitutional to make the presumptions mandatory in the absence of contrary evidence nor to permit the logical inferences arising from facts proved (killing by intentional use of deadly weapon), *State v. Williams, supra*, to remain and be weighed against contrary evidence if it is produced. The effect of making the presumptions mandatory in the absence of any contrary evidence is simply to impose upon the defendant a burden to go forward with or produce some evidence of all elements of self-defense or heat of passion on sudden provocation, or rely on such evidence as may be present in the State's case. The mandatory presumption is simply a way of stating our legal rule that in the absence of evidence of mitigating or justifying factors all killings accomplished through the intentional use of a deadly weapon are deemed to be malicious and unlawful. The prosecution need not prove malice and unlawfulness unless there is evidence in the case of their nonexistence. *Cf.* McCormick, Evidence § 346, n. 91 (2d Ed. 1972). We find this perceptive language in G. Fletcher, 'Two Kinds of Legal Rules: A Comparative Study of Burden-of-Persuasion-Practices in Criminal Cases,' 77 Yale L.J. 905 (1968) (cited in *Mullaney v. Wilbur, supra*, n. 16):

" 'The critical step in the conceptual evolution of malice is *MacKally's Case* [9 Co. Rep. 65b, 77 Eng. Rep. 828 (1611)]. That early 17th century decision, as reported and interpreted by Coke, stands for the principle that the prosecution need not prove the element of malice to con-

vict of murder. The judges realized that malice does not lend itself to affirmative proof; by and large, the malicious killing is defined by reference to what it is not, not by what it is. As agreed by all, one type that was not malicious was a killing provoked by a sudden quarrel. Thus, to have a triable issue of malice, one had to have a triable claim that the defendant killed in the course of a sudden quarrel.'

"The same, we believe, may be said of the element of unlawfulness. There is no suggestion in *Mullaney* that placing such a burden of producing evidence upon a defendant violates Fourteenth Amendment Due Process. 'Many States do require the defendant to show that there is "some evidence" indicating that he acted in the heat of passion before requiring the prosecution to negate this element by proving the absence of passion beyond a reasonable doubt. (Citations omitted.) Nothing in this opinion is intended to affect that requirement.' *Mullaney v. Wilbur, supra,* n. 28."

In *Ulster County Court v. Allen, supra,* --- U.S. ---, 60 L.Ed. 2d 777, the Supreme Court considered New York's statutory presumption which provided with certain exceptions that the presence in an automobile of any firearm "is presumptive evidence of its possession by all persons occupying" the automobile at the time the weapon is found. Defendants, all passengers in an automobile, were convicted of the possession of certain handguns found in the car when it was stopped for speeding. The trial judge instructed the jury on the effect of the statutory presumption. The New York Court of Appeals found no error and summarily rejected the argument that the presumption was unconstitutional. 40 N.Y. 2d 505, 354 N.E. 2d 836 (1976). In a federal habeas corpus proceeding, the Second Circuit Court of Appeals ordered a new trial on the ground that the statutory presumption, being mandatory in nature, was unconstitutional on its face. The Supreme Court reversed. Recognizing that "[i]nferences and presumptions are a staple of our adversarial system of factfinding," --- U.S. at ---, 60 L.Ed. 2d at 791, the Court stressed that their

"value . . . and . . . validity under the Due Process Clause vary from case to case . . . depending on the strength of the

State v. White

connection between the particular basic and elemental facts involved and on the degree to which the device curtails the factfinder's freedom to assess the evidence independently. Nonetheless, in criminal cases, the ultimate test of any device's constitutional validity in a given case remains constant: the device must not undermine the factfinder's responsibility at trial, based on evidence adduced by the State, to find the ultimate facts beyond a reasonable doubt." *Id.* at ---, 60 L.Ed. 2d at 791 (citations omitted).

The *Allen* Court then distinguished mandatory and permissive presumptions in the context of due process requirements. It noted that a *permissive presumption,* or inference: (1) permits but does not require the factfinder "to infer the elemental fact from proof by the prosecutor of the basic one and . . . places no burden of any kind on the defendant;" (2) may operate so that the basic fact constitutes "prima facie evidence of the elemental fact;" (3) is analyzed in the context of the specific factual situation of the case in which it is used, the Court requiring the party challenging it "to demonstrate its invalidity as applied to him;" and (4) must under the facts of the case employ some rational connection between the basic fact and the inferred elemental fact to comport with due process. *Id.* at ---, 60 L.Ed. 2d at 792. On the other hand, a *mandatory presumption:* (1) *requires* the factfinder to "find the elemental fact upon proof of the basic fact, at least unless the defendant has come forward with some evidence to rebut the presumed connection between the two facts;" (2) may be subdivided into two classes: those that "merely shift the burden of production to the defendant, following the satisfaction of which the ultimate burden of persuasion returns to the prosecution; and [those] that entirely shift the burden of proof [persuasion] to the defendant;" (3) is generally examined *on its face* "to determine the extent to which the basic and elemental facts coincide;" and (4) turns, for its constitutional validity, on its "accuracy in the run of cases" to which it might be applied. *Id.* at ---, 60 L.Ed. 2d at 792-93. Furthermore, "[i]n deciding what type of inference or presumption is involved in a case, the jury instructions will generally be controlling, although their interpretation may require recourse to the statute involved and the cases decided under it." *Id.* at ---, n. 16, 60 L.Ed. 2d at 792.

Applying these principles to the case before it, the *Allen* Court concluded that New York's statutory presumption was permissive rather than mandatory. As instructed upon by the trial judge, the presumption described for the jury "a permissive inference available only in certain circumstances, rather than a mandatory conclusion of possession," which could be ignored by the jury "even if there was no affirmative proof offered by defendants in rebuttal." The instructions as given made it clear that the prosecution's case rested only partly on the force of the presumption. Thus, the Court of Appeals erred in treating the presumption as a mandatory one, examining it on its face and trying to determine how it might operate in hypothetical situations. The presumption being permissive, the proper course was to analyze its application to the case at hand. And, "[a]s applied to the facts of this case, [facts which indicated that the passengers in the vehicle knew of the existence of the weapons and were in a position to exercise control and dominion over them] the presumption of possession is entirely rational." *Id.* at ---, 60 L.Ed. 2d at 795. It comported with the standards earlier laid down in *Leary v. United States*, 395 U.S. 6 (1969), and *Tot v. United States*, 319 U.S. 463 (1943), that there be a " 'rational connection' between the basic facts that the prosecution proved and the ultimate fact presumed, and the latter is 'more likely than not to flow from' the former." *Id.* at ---, 60 L.Ed. 2d at 797.

Finally, the *Allen* Court rejected defendants' argument that the statutory presumption must be rejected unless a jury could infer the elemental fact (possession) from the proven fact (presence in automobile) beyond a reasonable doubt. The Court said that this argument

"overlooks the distinction between a permissive presumption on which the prosecution is entitled to rely as one not-necessarily-sufficient part of its proof and a mandatory presumption which the jury must accept even if it is the sole evidence of an element of the offense.

"In the latter situation, since the prosecution bears the burden of establishing guilt, it may not rest its case entirely on a presumption unless the fact proved is sufficient to support the inference of guilt beyond a reasonable doubt. But in the former situation, the prosecution may rely on all the

evidence in the record to meet the reasonable doubt standard. There is no more reason to require a permissive statutory presumption to meet a reasonable doubt standard before it may be permitted to play any part in a trial than there is to require that degree of probative force for other relevant evidence before it may be admitted. As long as it is clear that the presumption is not the sole and sufficient basis for a finding of guilt, it need only satisfy the test described in Leary.

"The permissive presumption, as used in this case, satisfied the Leary test. And, as already noted, the New York Court of Appeals has concluded that the record as a whole was sufficient to establish guilt beyond a reasonable doubt." *Id.* at ---, 60 L.Ed. 2d at 797-98.

In *Sandstrom v. Montana, supra,* --- U.S. ---, 61 L.Ed. 2d 39, defendant Sandstrom was prosecuted for deliberate homicide, an essential element of which was that the homicide be "committed purposely or knowingly." Defendant admitted killing the deceased but denied that he did so deliberately. Basing his argument upon the testimony of two mental health experts who described defendant's mental state at the time of the killing, defendant's attorney contended that defendant, "due to a personality disorder aggravated by alcohol consumption, did not kill [the victim] 'purposely or knowingly.' " *Id.* at ---, 61 L.Ed. 2d at 44. However, the trial judge instructed the jury that "the law presumes that a person intends the ordinary consequences of his voluntary acts." He did not further elaborate on the presumption. The Supreme Court concluded that this instruction violated "the Fourteenth Amendment's requirement that the State prove every element of a criminal offense beyond a reasonable doubt." *Id.* at ---, 61 L.Ed. 2d at 43.

As in the *Allen* case, the *Sandstrom* Court noted that its first task was to determine the nature of the presumption described by the jury instructions. Such determination "requires careful attention to the words actually spoken to the jury . . . for whether a defendant has been accorded his constitutional rights depends upon the way in which a reasonable juror could have interpreted the instruction." *Id.* at ---, 61 L.Ed. 2d at 45. The Court then rejected the State's argument that the instruction described a mere

permissive inference or at most a mandatory presumption which placed upon the defendant the burden only to produce "some" contrary evidence. Instead, the Court noted that in the absence of further elaboration by the trial judge, a reasonable juror could have interpreted the instruction as either "an irrebuttable direction by the court to find intent once convinced of the facts triggering the presumption" or "a direction to find intent upon proof of the defendant's voluntary actions . . . unless *the defendant* prove the contrary by some quantum of proof which may well have been considerably greater than 'some' evidence — thus effectively shifting the burden of persuasion on the element of intent." *Id.* at ---, 61 L.Ed. 2d at 47. (Emphasis original.) If considered as a conclusive, irrebuttable presumption, the instruction could not stand under the holding in *Morissette v. United States*, 342 U.S. 246, 274 (1952) that where intent is an element of the crime "the trial court may not withdraw or prejudge the issue by instruction that the law raises a presumption of intent from an act." *Quoted in id.* at ---, 61 L.Ed. 2d at 49. If interpreted as shifting the burden to defendant to disprove the requisite mental state, the presumption runs afoul of the decision in *Mullaney v. Wilbur*, *supra*, 421 U.S. 684.

[1-7]   The analysis employed in *Allen* and *Sandstrom* reinforces this Court's determination in *State v. Hankerson, supra*, 288 N.C. 632, 220 S.E. 2d 575, of the effect of *Mullaney* on our old presumptions of malice and unlawfulness in homicide cases. Furthermore, regarding presumptions generally, the following principles emerge from *Mullaney, Allen* and *Sandstrom:* The nature of the presumption must first be determined by careful examination of the actual words spoken to the jury by the trial judge in the light of whatever definition of the presumption may be provided by applicable statute or case law and in the context of how a reasonable juror might interpret the words. If, in the contemplation of a reasonable juror, these words describe a mere *permissive* inference, due process is not violated so long as (1) there is a rational connection between the basic and elemental facts such that upon proof of the basic facts, the elemental facts are more likely than not to exist, and (2) there is other evidence in the case which, taken together with the inference of presumption, is sufficient for a jury to find the elemental facts beyond a reasonable doubt. Whether the necessary rational connection be-

tween the basic and elemental facts exists depends not on an examination of the permissive presumption in the abstract but rather on how the presumption is applied in the context of the particular facts of the given case. If the words of instruction describe an inference which must be drawn upon the proof of basic facts, then the presumption is *mandatory* in nature. Mandatory presumptions which conclusively prejudge the existence of an elemental issue or actually shift to defendant the burden to disprove the existence of an elemental fact violate the Due Process Clause. Mandatory presumptions which merely require defendant to come forward with *some evidence* (or take advantage of evidence already offered by the prosecution) to rebut the connection between the basic and elemental facts do not violate the Due Process Clause so long as in the presence of rebutting evidence (1) the mandatory presumption disappears, leaving only a mere permissive inference, and (2) the other requirements for permissive inferences described above are then met. Mandatory presumptions which require defendant to come forward with a quantum of evidence significantly greater than "some evidence" may run afoul of due process by shifting the burden of persuasion to defendant. In the absence of *any* rebutting evidence, however, no issue is raised as to the nonexistence of the elemental facts and the jury may be directed to find the elemental facts if it finds the basic facts to exist beyond a reasonable doubt. A mandatory presumption is generally examined on its face; its validity depends ultimately upon its hypothetical accuracy in the general run of cases in which it might be applied. Finally, if the prosecution relies solely upon a presumption, whether mandatory or permissive, to make out its case, then the rational connection between the basic and elemental facts must be such that a jury could infer the existence of the elemental facts beyond a reasonable doubt.

[8] We turn now to an application of these principles to the presumption involved in the case before us. Examining the language of the trial judge's instructions in light of our case law on the subject and in light of the likely effect the language had upon the minds of reasonable jurors, we are confident that the instructions gave the State the benefit of a mandatory presumption of defendant's paternity. The jury must have understood that it would find the issue of paternity against defendant upon proof that the child was born during the marriage of her mother and

defendant, unless there was some evidence in the case that defendant could not have had access to the mother during a reasonable period of gestation. The instructions thus described, in pertinent part, the definition of our common-law presumption of legitimacy. "When a child is born in wedlock, the law presumes it to be legitimate [*i.e.*, the child of the mother's husband], and the presumption can be rebutted only by facts and circumstances which show that the husband could not have been the father, as that he was impotent or could not have had access to his wife." *Eubanks v. Eubanks*, 273 N.C. 189, 197, 159 S.E. 2d 562, 568 (1968).

There is strong public policy supporting this presumption. The law, as it ought, favors the legitimacy of children. Children of a married woman ought to be, and almost always are in fact, fathered by her husband. The presumption recognizes this. It presumes and promotes the integrity of the family—the seminal unit of society as we know it. Nonetheless the presumption must comport with the Due Process Clause of the Fourteenth Amendment. The question is whether the nature of the rebutting evidence traditionally required, *i.e.*, that the husband could not *possibly* be the father because of impotency or his lack of physical access to the mother, is so stringent and so inherently convincing on the issue of paternity that, in effect, the burden of persuasion is impermissibly shifted to defendant.

The United States Supreme Court has not definitively determined the exact quantum of evidence which a defendant, within the dictates of due process, may be required to produce in order to avoid the effect of a mandatory presumption. It has spoken approvingly of a requirement that defendant come forward with "some evidence" contrary to the presumed fact, *Mullaney v. Wilbur, supra,* 421 U.S. at 701, n. 28, or "some evidence to rebut the presumed connection between the [basic and elemental] facts." *Ulster County Court v. Allen, supra,* --- U.S. at ---, 60 L.Ed. 2d at 792. The Court has cautioned, however, against requiring a defendant to produce a quantum of evidence "considerably greater than 'some' evidence," in order to rebut a mandatory presumption. *Sandstrom v. Montana, supra,* --- U.S. at ---, 61 L.Ed. 2d at 47. We noted in *State v. Hankerson, supra,* 288 N.C. 632, 220 S.E. 2d 575, that to require a defendant to produce enough evidence to "satisfy the jury" of the nonexistence of the

presumed elemental facts (malice and unlawfulness) impermissibly shifted to defendant the burden of persuasion on the issue of the existence of these facts. We held in that case that a defendant could rebut the presumption merely by offering evidence (or relying on evidence offered by the State) *sufficient to raise a factual issue* as to the existence of the elemental facts. Our view in *Hankerson* was that due process would not permit giving defendant a greater burden of production.

[8]   So it is here. We hold that to require a defendant-husband to offer evidence of the physical impossibility of his fatherhood in order to rebut the presumption of paternity places upon him a burden of production so stringent that, in effect, it unconstitutionally shifts the burden of persuasion to him on this issue. Due process precludes requiring that the defendant, in order to rebut the mandatory presumption, do more than offer some evidence which is sufficient to raise a factual issue as to the paternity of the child.

[9]   What, then, constitutes sufficient evidence to raise such a factual issue? We hold that the rebutting evidence must at least tend to show: (1) that defendant could not be the father because, for example, he did not in fact have sexual relations with his wife at a time when conception could have occurred; or (2) that even if defendant could be the father, some other man also could be the father because that other man had sexual relations with the mother at a time when conception could have occurred.

[10]   Upon the production of the type of rebuttal evidence referred to above, the presumption of legitimacy disappears and the State is left to prove paternity beyond a reasonable doubt from all the facts and circumstances in the case. If, however, there is evidence in the case that the child was born or conceived during wedlock, then the jury may be permitted, but not required, to infer paternity of the husband provided under all the facts and circumstances of a given case there is a rational connection between the basic facts proved and the elemental facts inferred. The State, furthermore, may rely entirely on the inference to make out its case provided under all the facts and circumstances of a given case the rational connection is strong enough to permit the jury to make the inference beyond a reasonable doubt. The burden of persuasion beyond a reasonable doubt on the case of paternity remains with the State.

[11]  In the absence of the required rebutting evidence the State need only prove beyond a reasonable doubt that the child was conceived or born in wedlock. The jury may then be instructed to find the issue of paternity against the husband, for there would be no evidence in the case raising an issue of his paternity.

[12]  The time when conception could have occurred will vary from case to case. The average, or normal, time between conception and birth is generally accepted to be 266 to 270 days, but whether a particular pregnancy could have extended for a longer or shorter period may be a proper subject for expert medical opinion. *See* 2 Taylor, Principles and Practices of Medical Jurisprudence 24 (12th Ed. 1965); 5B Lawyer's Medical Cyclopedia, § 37.2a (1972); *Eubanks v. Eubanks, supra*, 273 N.C. at 196, 159 S.E. 2d at 568. Even without expert testimony, however, *undisputed* facts in a given case — such as the child's being full term or the time of the mother's last menstruation prior to birth — may establish conclusively when conception could or could not have occurred. If this time is so established and if there is likewise no dispute regarding when the husband had or could have had sexual relations with the mother or when some other man had sexual relations with her, whether sufficient evidence has been offered to rebut the presumption becomes a question of law for the court.

[13]  Such is the case here. The evidence was insufficient as a matter of law to rebut the mandatory presumption of defendant's paternity. Although the trial judge's instructions placed too high a burden on defendant to rebut this presumption, defendant was not prejudiced by the error because there was no evidence in the case sufficient to raise an issue of paternity and, thereby, rebut the presumption. It is undisputed that the mother first missed menstruation in July 1977 and that a full term, eight pound, ten ounce baby was born some nine calendar months thereafter. There is no evidence suggesting that anything other than pregnancy caused the missed menstruation or that the mother menstruated at any time between July 1977 and the birth. Absent such evidence, which defendant has the burden to produce, conception must have been the cause of and preceded the missed menstruation. 2 Taylor, *supra* at 22. Conception, therefore, according to all the evidence, must have occurred at a time when defendant was living with and could have had sexual relations with his wife and before her sexual encounters with the witness Carl

Pinnley. Neither the State nor defendant, consequently, produced any evidence that defendant could not be the father of the child or that someone other than defendant could be.

We are not inadvertent to, but decline to follow, the rationale of *People v. Thompson*, 152 Cal. Rptr. 478, 89 Cal. App. 3d 193 (1979), which sustained a statutory conclusive presumption of paternity that provided: ". . . [t]he issue of a wife cohabiting with her husband, who is not impotent or sterile, is conclusively presumed to be the child of the marriage." The California Court of Appeals held that it was not violative of due process to preclude a defendant-husband faced with the presumption from offering evidence designed to raise a reasonable doubt as to his paternity and thus rebut the presumption. Defendant's wife, had she been permitted to testify, would have said she was "unsure" whether defendant was the biological father of the child. The California Court of Appeals held that this testimony was properly excluded. It reasoned that the statutory presumption was not really a presumption at all but rather a statement of substantive law that any potent and virile husband cohabiting with his wife is deemed to be the legal "father" of issue born of the wife notwithstanding that he may not be the biological "father." The Court concluded that the California Legislature did not intend "to limit criminal responsibility [for nonsupport] to the 'biological' or 'natural' . . . father" and that "proof of biologic parenthood is not an essential element of proof of guilt [under the nonsupport statutes.]" 152 Cal. Rptr. at 483, 484, 89 Cal. App. 3d at 201. It relied on a California Supreme Court decision which, according to the Court of Appeals, "held blood tests . . . inadmissible where the conclusive presumption applied." 152 Cal. Rptr. at 481, 89 Cal. App. 3d at 196.

We do not understand our common-law presumption of the husband's paternity to be a rule of substantive law making biological paternity irrelevant in a prosecution under G.S. 14-322. That traditionally the presumption could be rebutted by showing impossibility of biological paternity or even that the wife was "notoriously living in open adultery," *Eubanks v. Eubanks, supra*, 273 N.C. at 197, 159 S.E. 2d at 568, militates against such an understanding. Furthermore, our Legislature has specifically provided that blood grouping test results are admissible "[i]n the trial of any criminal action or proceeding in any court in which

the question of parentage arises, regardless of any presumptions with respect to parentage;" and if the results show that "defendant cannot be the natural parent of the child," then, in effect, the presumption is not only rebutted but the jury is to be peremptorily instructed in defendant's favor on the issue. G.S. 8-50.1.

While we do not choose to follow the rationale of *Thompson*, we note that the evidence sought to be proffered in *Thompson* would, standing alone, be insufficient to rebut our presumption of paternity under the construction we have given it here.

[14] Defendant argues, finally, that the presumption of paternity was rebutted in the case under our traditional rules by evidence that the wife was "notoriously living in open adultery." *See Eubanks v. Eubanks, supra*, 273 N.C. at 197, 159 S.E. 2d at 568. We do not believe the evidence was sufficient to establish this fact. All it shows is that at some time after conception the mother moved to Asheville where she "had an affair" with the witness Carl Pinnley. The evidence does not show that the affair was notorious, open, or that she and Pinnley were living together at the time. More importantly, however, the evidence does not show that these events occurred at a time when conception could have occurred.

In the trial, therefore, we find no prejudicial error, and the decision of the Court of Appeals is

Affirmed.

Justice CARLTON did not participate in the consideration or decision of this case.

Justice COPELAND dissenting.

I fully agree with the majority that the burden of persuasion was impermissibly shifted to the defendant in this case because in order to rebut the presumption of legitimacy he was required to prove nonaccess during the period of conception. The burden of *persuasion* on any element of a criminal offense may not through the use of presumptions be shifted to a defendant; however, the burden of *production* may be placed on the defendant to produce some evidence to raise a factual issue on the question involved. If the defendant fails to produce such evidence then the presump-

tion remains in the case and is mandatory. If the defendant does produce such evidence then the presumption disappears but the natural inferences arising from the proven facts from which the jury may or may not draw a certain conclusion remain in the case.

The majority holds that shifting the burden of persuasion to the defendant was harmless error since defendant did not meet the burden of production as it is defined in the majority opinion. Under the rule announced today a defendant can meet his burden of production sufficient to rebut the presumption of legitimacy and leave only the inferences that arise from the proven facts if he has some evidence that although he had access to his wife he in fact did not have sexual relations with her or that someone else had sexual relations with her during the period of conception.

Defendant produced such evidence. The majority holds that he did not produce such evidence because the evidence conclusively shows that

"[c]onception . . . according to all the evidence, must have occurred at a time when defendant was living with and could have had sexual relations with his wife and before her sexual encounters with the witness Carl Pinnley."

The conclusive evidence relied upon by the majority is as follows:

"The mother first missed menstruation in July 1977 and . . . a full term, eight pound, ten ounce baby was born some nine calendar months thereafter."

I dissent because I find the evidence to be far from conclusive. The majority is without evidence as to what time during the month of July she should have had her normal cycle. If it was July 1, nine calendar months later would be April 1 and the baby was born on May 4, 1978. If it was the last day of July then nine calendar months later would be the last day of April which is much closer to the baby's date of birth.

The trial judge in this case relied upon instructions regarding the period of conception that are quoted with approval in *State v. Hickman*, 8 N.C. App. 583, 174 S.E. 2d 609 (1970) in instructing the jury as follows:

"This period of time which the law recognizes is the period of time during which the child could have been conceived is a

period of time sometimes referred to in the law as *normal* period of gestation. *May be anywhere from seven, eight, nine, nine and a half or ten months from the date of birth of the child*, and the only way the assumption (presumption) of legitimacy may be rebutted is by evidence tending to show the husband *could not have had access to the wife during the period of time referred to*." [Emphasis added.]

This rule stretches the parameters for the period of conception for a normal pregnancy to its maximum but it is a possibility and it was employed in the trial of this case. It would certainly include the time after defendant and his wife separated and she began her relations with Pinnley. If this period of time for conception were to be used then defendant did meet his burden of production.

The average term of pregnancy is 280 days. *Eubanks v. Eubanks*, 273 N.C. 189, 159 S.E. 2d 562 (1968). This term includes both the period of time from last menstruation to conception (an average of 14 days) and the time from conception to birth (an average of 266 and not 280 days). As stated in 5B *Lawyer's Medical* Cyclopedia § 37.2a (1972):

"The average duration of pregnancy is 266 days. This means that delivery should occur ten lunar months (280 days) following the first day of the last menstrual period. The calculation of the expected delivery date employs Naegele's rule, as follows:

A. Subtract three months from the first day of the last menstrual period.

B. To the date obtained in A, add seven days.

. . .

In clinical practice, only 4% of women deliver on their due date, but 80% deliver within the period of two weeks before and two weeks after the calculated date."

Starting with the date of birth, May 4, 1978, and counting back 266 days, the date obtained is August 11, 1977. The 280th day would be July 28, 1977. Defendant separated from his wife on August 12, 1977 (the 265th day) and she began sexual relations with Pinnley on August 15, 1977 (the 262nd day).

It may be far more likely that conception occurred in July of 1977 while defendant and his wife were living together but the evidence is not conclusive on that point. This is a criminal case and I do not believe that the constitutional error committed was harmless beyond a reasonable doubt. Since the *average* number of days from conception to birth is 266 days and the calculations are no more accurate than plus or minus two weeks from the woman's last menstruation even for a full term, normal pregnancy, there is at least a reasonable possibility that conception occurred at the point when she separated from her husband and began relations with Pinnley. The conception of the child may have been the last product of her relationship with her husband or the first product of her sexual affair with Pinnley. Pinnley, and not her husband, was the more likely object of her affections at that point in time.

For these reasons I believe that scrupulous concern for the fairness of the process and of the result requires that there be a new trial at which the jury would be applying the law as set forth in this opinion to the evidence as presented. Under the majority's conclusion that will not be achieved in this case due to the conclusive evidence the majority discerns from the record.